Jonathan C. SHAW, Petitioner–Appellant,

v.

Cal TERHUNE, Respondent–Appellee.

No. 02–16829.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 13, 2003.

Filed Dec. 22, 2003.

Suzanne A. Luban, Oakland, CA, for the appellant.

Christopher W. Grove, Deputy Attorney General, San Francisco, CA, for the appellee.

Before WALLACE, HALL, and O'SCANNLAIN, Circuit Judges.

CYNTHIA HOLCOMB HALL, Senior Circuit Judge:

Jonathan Shaw appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. Shaw was convicted in a California state court

on multiple counts of, assault, robbery, and attempted robbery in connection with an armed robbery of a Lyon's restaurant. Shaw was sentenced to 136 months in prison, which included a sentence enhancement imposed for "personal use" of a firearm during the assault and attempted robbery of Cheryl Bishop, the restaurant manager.[1] More than two years after Shaw's conviction, his accomplice in the armed robbery, Mango Watts, was convicted on the same counts. Watts's sentence also included a "personal use" enhancement, despite the fact that the evidence presented at both trials indicated that only one person directly participated in the assault and attempted robbery of Bishop, and therefore that only one person had personally used a firearm during the incident. Shaw asserts that his due process rights were violated by the state prosecutor's advancement of factually inconsistent arguments at the two trials, which precipitated inconsistent jury verdicts. His habeas petition was denied by the district court on August 5, 2002.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we now conclude that the state court decision upholding Shaw's conviction was neither "contrary to," nor an "unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Accordingly, we now AFFIRM the denial of Shaw's petition for a writ of habeas corpus.

## I.

### A. Background

On December 13, 1995, Petitioner Jonathan Shaw was convicted of multiple counts of assault, robbery, and attempted robbery stemming from a September 3, 1995 armed robbery of a Lyon's restaurant. On March 30, 1998, Shaw's accomplice in the armed robbery, Mango Watts, was convicted on several counts of assault, robbery, and attempted robbery in connection with the same incident.

The evidence presented at both Shaw's and Watts's trial, discussed in further detail below, indicated that only one person had directly participated in the assault and attempted robbery of Bishop, and therefore, only one person had personally used a firearm in perpetrating the crime. Nonetheless, in both Shaw's and Watts's trial, the prosecutor argued in closing that the defendant currently before the jury had personally used a firearm during the robbery. At the conclusion of each trial, the respective juries each found that the current defendant had personally used a firearm during the commission of the crime. Specifically, each defendant was found to have held a gun to the head of the restaurant's manager, Cheryl Bishop, while ordering her to open the restaurant's safe.

### B. Shaw's Trial

At the trial of Jonathan Shaw, the prosecution offered the testimony of several witnesses to support the contention that Shaw had used a firearm during the commission of the robbery of Lyon's restaurant.

Michelle Jackson testified that while she and her friend, Dawn McGhie, were waiting to be served, they saw a hooded man, who Jackson recognized as a man named "Bob," demand money from the bartender at gunpoint. When "Bob" turned and saw

---

1. *See* Cal.Penal Code § 12022(c) ("[A]ny person who personally uses a firearm in the commission of [an enumerated felony or attempted felony] shall be punished by an additional and consecutive term of imprisonment in the state prison for three, four, or five years.") (West 2003).

Jackson and McGhie, perhaps wary of having been recognized, he shouted "let's get out of here." Immediately thereafter, Jackson saw another man, who she recognized as Shaw, exiting the kitchen area brandishing a gun. A few moments later, Jackson observed Watts running from the same direction.

Dawn McGhie, Jackson's dinner companion, testified that she witnessed many of the same events as Jackson. She recalled identifying Shaw as the first man running from the kitchen after hearing Jackson exclaim, "Oh, my God, that's [Shaw]." She also recalled seeing a second individual exit the kitchen shortly thereafter.

Eva Birrueta, a hostess at Lyon's restaurant, was working on the evening of September 3, 1995. Biruetta testified that, while working at the front cash register, one of the hooded men struck her on the head with a gun. She also observed one of the men hit her co-worker, Sonia Marin, but was unable to determine whether Shaw was the person responsible for striking either Marin or herself.

Sonia Marin testified that she was waiting tables the night of the robbery. She was assaulted by one of the hooded men, who struck her on the right side of her head with a gun, then forced her to lead him to Cheryl Bishop, the manager of the restaurant. However, Marin was unable to identify the specific individual who assaulted her.

Christine Gulutz, a bartender, was also working at Lyon's on September 3. While she was behind the bar, a hooded man approached her and demanded "all the money" at gunpoint. Gulutz complied with his demand.

Finally, the prosecution offered the testimony of Cheryl Bishop, the manager of Lyon's. Bishop could recall being led to the safe with a gun pointed at her head, and told by her assailant that "he was going to count to five and[the safe] had better be opened." However, Bishop admitted on cross-examination that she could not identify her attacker.

In closing arguments, the prosecutor summarized his theory of the case for the jury. He surmised that Mango Watts had assaulted Birrueta and taken money from the front cash register, while the unknown accomplice (who Michelle Jackson referred to as "Bob") demanded money from Gulutz at the bar. The prosecutor emphasized that Shaw was liable for the independent acts of Watts and "Bob" as an aider and abettor. For his own part, the prosecutor suggested that Shaw had personally assaulted Marin by striking her with his gun, and had held a gun to Bishop's head while attempting to rob her.

In defense, Shaw's attorney offered no exculpatory evidence. Rather, he argued that Shaw was the victim of mistaken identity, supporting his argument by casting doubt on the eyewitness testimony and emphasizing the lack of physical evidence.

Ultimately, the jury returned a guilty verdict against Shaw on all counts. The jury found, *inter alia*, that Shaw had personally used a firearm in connection with the assault and attempted robbery of Bishop. Shaw was thereafter sentenced to eleven years and four months in prison.

## C. Watts's Trial

Watts's trial commenced on March 26, 1998, after his first trial had ended in a hung jury. The prosecutor contended to the jury that the evidence would show that Watts was "the one who was at the back safe dealing with Miss Bishop." Conversely, Watts's attorney asserted that the evidence would demonstrate that Shaw, not Watts, was the person identified as Bishop's assailant.

Eva Birrueta testified for the prosecution. For the most part, she simply repeated the gist of her earlier testimony. However, she also positively identified Watts as the man who had struck her at the front cash register, explaining her failure to do so during the earlier trial as a response to being frightened.

Dawn McGhie also testified, maintaining that Shaw had been the first robber to emerge from the kitchen, and that she had recognized him after hearing her friend, Michelle Jackson, shout out his name. In addition, McGhie also testified, though not unequivocally, that she concluded the second assailant to run from the kitchen was Watts after Jackson had screamed his name in recognition.

Finally, as in the first trial, Cheryl Bishop recounted her recollection of the September 3 events. As in Shaw's trial, Bishop was unable to identify her assailant as either Shaw or Watts.

On March 30, 1998, Watts was convicted on all counts of robbery, attempted robbery, and assault. The jury concluded that Watts had personally used a firearm in connection with the assault and attempted robbery of Bishop.

### D. *Habeas Petition*

In January 2001, Shaw became aware of the California Court of Appeals' decision in Watts's case, which stated that "under any version of the evidence, only one man actually held a gun to Ms. Bishop's head.... Indeed, the evidence adduced at trial, which presumably was available to the prosecutor prior to trial, tends to support the conclusion that the jury in [Shaw's] trial was mistaken." *People v. Watts*, 76 Cal.App.4th 1250, 1259–61, 91 Cal.Rptr.2d 1 (1999). On January 25, 2001, Shaw filed a *pro per* exhaustion petition in the California Supreme Court. The petition was denied on January 30, 2001. On May 4,

2001, Shaw amended a pending habeas petition to assert a due process claim and an actual innocence claim. The district court denied the petition on August 5, 2002, and Shaw timely appealed.

### II.

■ Shaw's petition for habeas corpus is governed by the standards set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d). Under AEDPA, we may only grant Shaw's petition if the state court's rejection of his due process claim was (1) "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court;" or (2) an unreasonable interpretation of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1); *Van Tran v. Lindsey*, 212 F.3d 1143, 1154 (9th Cir.2000), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) ("[W]e may not, of course, reverse a state court's decision simply because it is inconsistent with a rule established by a Ninth Circuit case."). The phrase "clearly established federal law" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state court decision." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

Because Shaw's petition is governed by AEDPA, our inquiry is limited to two narrow issues: first, whether Supreme Court precedent clearly establishes that a prosecutor may not offer factually inconsistent interpretations of the same evidence in separate trials of two defendants; and second, whether Supreme Court precedent clearly establishes that factually inconsistent convictions violate due process. Though we are dismayed by the prosecu-

tor's decision to seek the personal use enhancement against Watts after successfully arguing in Shaw's trial that Shaw, not Watts, was the individual who personally used a firearm against Bishop, we cannot conclude that the prosecutor's conduct violated Shaw's clearly established due process rights. Thus, we answer each of the aforementioned questions in the negative.

### A.

■ Shaw argues that his due process rights were infringed by the prosecutor's decision to argue factually inconsistent positions in the cases against himself and Watts. While the Supreme Court has long held that a prosecutor has a duty to refrain from knowingly presenting false evidence, assuming prejudicial facts not in evidence, and using other "improper methods calculated to bring about a conviction," *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the Court has never found a due process violation where there is no indication that false evidence was presented or that the prosecutor believed that his theory of the case was inaccurate.

■ The most direct support Shaw can marshal for his position is our holding in *Thompson v. Calderon*, 120 F.3d 1045 (1997) (en banc), *rev'd on other grounds*, 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998). At the outset, it is important to note that in the context of a habeas petition interpreted under the auspices of AEDPA, a Ninth Circuit decision without supporting Supreme Court precedent is not binding. *Van Tran*, 212 F.3d at 1154 ("[W]e may not, of course, reverse a state court's decision simply because it is inconsistent with a rule established by a Ninth Circuit case."). Nonetheless, "[o]ur cases may be persuasive authority for purposes of determining ... what law is 'clearly established.'" *Id.*

In *Thompson*, the prosecution offered conflicting motive theories in the separate trials of two men charged with the same murder. The first defendant, Thompson, was convicted and sentenced to death under a theory that he raped the victim, then killed her in order to cover up his actions. 120 F.3d at 1056. The second defendant, Leitch, was prosecuted in a separate trial, in which he was convicted on the theory that he wanted to kill the victim because he perceived her as an obstacle to reconciling with his estranged ex-wife. *Id.* Under the theory used to prosecute Leitch, Thompson was portrayed as a somewhat unwitting accomplice. *Id.* The prosecutors presented a completely different lineup of witnesses in each trial, many of which offered directly contradictory stories. *Id.* at 1057. A majority of the *en banc* panel determined that this manner of prosecutorial misconduct constituted a due process violation, holding that "flip flopping of theories ... is inherently unfair." *Id.* at 1059 (quoting *Drake v. Kemp*, 762 F.2d 1449, 1479 (11th Cir.1985) (en banc) (Clark, J., concurring)).

Our decision in *Thompson*, however, is sufficiently dissimilar to the instant case that it is distinguishable. The holding in *Thompson*, as well as the 11th Circuit case upon which its analysis was fundamentally based, was premised on the "peculiar facts" of the case. *Thompson*, 120 F.3d at 1059 (quoting *Drake*, 762 F.2d at 1479). The prosecutor in *Thompson* did not merely suggest varying interpretations of ambiguous evidence; he "manipulated evidence and witnesses, argued inconsistent motives, and at Leitch's trial essentially ridiculed the theory he used to obtain a conviction and death sentence at Thompson's trial." *Thompson*, 120 F.3d at 1057. Specifically, the prosecutor in *Thompson*

developed evidence supporting his theory that the victim had been killed to cover up a rape, used that evidence throughout the pretrial proceedings against Leitch, then completely abandoned that evidence in favor of directly contradictory evidence supporting the theory used to convict Thompson, only to return to the rape cover up theory at Leitch's subsequent trial. *Id.* By doing so, the prosecutor brought his conduct squarely within an area forbidden by the Supreme Court—the "knowing[ ] present[ation of] false testimony." *Id.* at 1058 (citing *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935)).

In this case, Shaw does not contend that the prosecutor presented false evidence,[2] and in reality cannot do so, because the evidence was nothing more than ambiguous.[3] The evidence presented at the two trials was almost identical, and supported several critical conclusions: (1) Shaw, Watts, and an accomplice called "Bob" committed the robbery; (2) "Bob" assaulted and robbed Christina Gulutz; (3) either Shaw or Watts assaulted and robbed Eva Birrueta; (4) either Shaw or Watts assaulted Sonia Marin; (5) either Shaw or Watts assaulted and attempted to rob Cheryl Bishop; and (6) the person who assaulted Marin was likely the same person who assaulted and attempted to rob Bishop.[4] At Shaw's trial, the prosecutor argued that these facts established that Shaw had assaulted Bishop. Subsequently at Watts's trial, another prosecutor from the same office argued that the same evidence should be interpreted as establishing that it was Watts who had assaulted Bishop.

Unlike the situation in *Thompson,* the prosecutor in the instant matter presented no false evidence whatsoever. The evidence presented in Shaw's trial tended to prove that either he or Watts was the person responsible for assaulting and attempting to rob Cheryl Bishop. There were no unequivocal eyewitness accounts which cast the blame on either individual; in fact, the victim herself was unable to identify her assailant. The thrust of the prosecutor's argument to the jury was that

---

**2.** The closing arguments of counsel are not evidence.

**3.** In deciding Watts's appeal, the California Court of Appeals similarly concluded that the prosecution had, at most, offered evidence that was ambiguous in the two trials:

There is no indication that the prosecution caused the witnesses to change their testimony from that given during the prosecution of Shaw, or that the prosecutor otherwise acted improperly in securing [Watts's] conviction. Although it is true that only one offender could have committed the specific acts against Bishop, the nature of trial proceedings, the nature of the crimes and the nature of the evidence of those crimes, makes it perfectly possible that [Watts] was the individual who committed the crimes, notwithstanding that some other jury, in some other prosecution, concluded that they were committed by Shaw.

*People v. Watts,* 76 Cal.App.4th 1250, 1260, 91 Cal.Rptr.2d 1 (1999).

**4.** Other aspects of the evidence were either inconsistent, unclear, or called into question during cross-examination. For example, both Jackson and McGhie testified that Shaw kicked a female employee after exiting the kitchen, but none of the female employees confirmed being kicked. In addition, McGhie testified that Shaw exited the kitchen immediately after "Bob" shouted "let's go," but later implied that Shaw had already exited the kitchen at that point. Jackson, by contrast, testified consistently that she saw Shaw exit the kitchen area *before* she heard Bob shout. Finally, owing in part to translation difficulties, Birrueta's equivocating testimony at Watts's trial that she recognized him from the robbery suggested that she may only have recognized Watts from previous encounters at trial.

the ambiguous evidence should be interpreted as proof of the defendant's guilt. Admittedly, the prosecutor disingenuously substituted two different names for the "the defendant" portion of his argument. However, that regrettable tactic does not rise to the level of a constitutional violation.[5]

Clearly established federal law prohibits a prosecutor from "knowingly presenting false evidence;" it does not preclude that prosecutor from suggesting inconsistent interpretations of ambiguous evidence.[6]

**5.** Even if a constitutional violation were found, it is not entirely clear that it would be *Shaw's* constitutional rights that had been violated, rather than *Watts's* rights. Shaw's suggestion to the contrary, that when prosecutors pursue inconsistent factual theories in consecutive trials, a reasonable presumption is that the due process rights of the first defendant convicted were violated, mischaracterizes our holding in *Thompson.*

In *Thompson,* we concluded that the rights of Thompson, the first defendant convicted, had been transgressed, but not because of the timing of his conviction. Rather, we held that Thompson's rights were violated because "[f]rom the beginning, the prosecutor's theory was that the murder resulted from Leitch's plot to eliminate his former girlfriend" in order to reconcile with his ex-wife, and that it was only in the subsequent trial of Thompson that the prosecutor "change[d] the theory and the arguments, and offer[ed] facts that directly conflicted with the underlying premise of the charges he brought." *Thompson,* 120 F.3d at 1059. Our holding expressed particular dismay over the fact that, when he turned to the prosecution of Leitch, "the prosecutor returned to his original theory and discredited the very evidence he had previously offered in Thompson's trial." *Id.* No such behavior is evident in the instant case. Certainly, there is no suggestion that, in order to obtain a conviction against Shaw, the prosecutor here manipulated facts in the devious manner employed by the prosecutor in *Thompson.* Therefore, the suggestion that we may, pursuant to our holding in *Thompson,* operate under a presumption that the rights of the first defendant convicted were violated by a prosecutor's subsequent change in theory is without basis.

Additionally, the sharply divided nature of our decision in *Thompson* undercuts the petitioner's position even further. In *Thompson,* six of eleven judges sitting en banc concurred as to the result of the case. Two of those six, however, Judges Tashima and Thomas, whose votes were necessary for the disposition of the case, did not completely subscribe to the majority's reasoning. To wit, in a concurrence, Judge Tashima suggested that he believed that the only due process rights violated were those of the defendant who had presented against him a case based on a version of facts that was untrue. *Id.* at 1064 & n. 2 (Tashima, J., concurring).

**6.** The dissent directs attention to our holding in *Nguyen v. Lindsey,* 232 F.3d 1236 (9th Cir.2000), a post-AEDPA habeas review of a prosecutor's use of inconsistent factual theories in separate trials against separate defendants, in which we approvingly cited *Thompson* while nevertheless concluding that it was inapposite. However, the dissent's own quotation from *Nguyen* confirms our analysis of *Thompson:*

> The Supreme Court has held that prosecutors violate a defendant's right to due process if they *knowingly use false evidence.* It follows that a prosecutor's pursuit of fundamentally inconsistent theories in separate trials against separate defendants charged with the same murder can violate due process *if the prosecutor knowingly uses false evidence* or acts in bad faith.

*Id.* at 1240 (emphasis added). In this case, the prosecutors did not knowingly use false information. While, on the other hand, the prosecutors may have acted in "bad faith" as a practical matter, *Nguyen* itself suggests the opposite conclusion from a legal standpoint. Our holding in *Nguyen* was primarily concerned with the "bad faith" manifested by a prosecutor's knowing presentation of false evidence, which has been flatly prohibited by clearly established federal law articulated by the Supreme Court. As we observed in dismissing Nguyen's similar claims, "it is true that the prosecutor made different arguments at each trial, but it is also true that these arguments were consistent with the evidence actually adduced at each trial." *Id.* Such is the case here, for while the prosecution's arguments in Shaw's and Watts's cases clearly differed, each "were consistent with the evidence actually adduced at each trial." *Id.*

When prosecutors confront truly ambiguous evidence that supports multiple convictions for what is inherently a unilaterally committed crime, there are competing concerns involved. In these situations, prosecutors must retain some amount of discretion to change theories in later trials.

For example, a renewed review of the evidence might "support the conclusion that the jury in [a previous] cases was mistaken." *Watts*, 76 Cal.App.4th at 1259–60, 91 Cal.Rptr.2d 1. In that event, there is the possibility that another trial may arguably be necessary in order to convict a guilty defendant, despite the fact that the second trial may render a prior conviction suspect. On the other hand, a conniving prosecutor may simply seek to obtain another notch in his belt by switching to a supportable, but weaker theory in the trial of a later defendant, whether the prosecutor is even convinced of the new theory himself. Either situation is plausible, and each presents a sufficiently distinct yet equally delicate inquiry for a reviewing court. The lack of Supreme Court guidance on such a delicate issue supports our conclusion that the law on this question has not yet been clearly established.

Since no clearly established federal law precludes a prosecutor from supporting two theories which are in tension with one another but which are each arguably supported by ambiguous evidence, Shaw's due process rights were not violated in such a way that habeas relief would be warranted on the first ground.

## B.

■ Shaw also contends that his due process rights were violated by state court decisions which were factually inconsistent. In particular, since even the prosecution concedes that only one person could have been responsible for personal use of a firearm in connection with the assault and attempted robbery of Bishop, jury verdicts assigning blame to both Shaw and Watts violate due process.

The Supreme Court has never directly addressed the issue of whether due process permits two persons to be convicted for a crime that only one person committed. The Court has, however, expressly rejected the proposition that due process always requires consistent convictions, noting that "[w]hile symmetry of results may be intellectually satisfying, it is not required." *Standefer v. United States*, 447 U.S. 10, 25, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980) (holding that an aider and abettor can be convicted of a charge even if the principal is acquitted); *see also Herrera v. Collins*, 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) ("[F]ederal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact."). In *Standefer*, the Supreme Court noted specifically that the prospect of "different juries ... reach[ing] different results under [a] criminal statute ... is one of the consequences we accept under our jury system." *Standefer*, 447 U.S. at 25, 100 S.Ct. 1999 (quoting *Roth v. United States*, 354 U.S. 476, 492 n. 30, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)). In view of *Standefer*, we cannot conclude that the state court's decision affirming Shaw's sentence enhancement was contrary to, or involved an unreasonable application of, clearly established federal law.

## III.

There is little doubt that the actions of the prosecutors in the case before us may be characterized as something between stunningly dishonorable and outright deplorable. The dissent's outrage at the prosecutors' "shocking indifference toward 'the fundamental conceptions of justice which lie at the base of our civil and

political institutions,'" *Hebert v. Louisiana,* 272 U.S. 312, 316, 47 S.Ct. 103, 71 L.Ed. 270 (1926), is eminently understandable. Nonetheless, in the context of a petition for a writ of habeas corpus, we are not at liberty to indulge our own conceptions of justice in the absence of "clearly established federal law." Thus, although we take exception to the prosecutor's use of factually inconsistent theories in the Shaw and Watts trials, neither this conduct nor the resulting convictions violated clearly established principles of due process. The district court properly denied Shaw's habeas petition.[7]

For the foregoing reasons, the district court's denial of Shaw's petition for a writ of habeas corpus is AFFIRMED.

WALLACE, Circuit Judge, dissenting:

On September 2, 1995, three armed men robbed a Lyons Restaurant in Santa Clara, California. One—and only one—of the three held a gun to Cheryl Bishop's head in an unsuccessful attempt to gain access to the restaurant's safe. *People v. Watts,* 76 Cal.App.4th 1250, 91 Cal.Rptr.2d 1, 7 (1999) ("[U]nder any version of the evidence, only one man actually held a gun to Bishop's head as she attempted to open the safe."). Nevertheless, state prosecutors acting in bad faith secured convictions and sentence enhancements against two individual defendants for an offense that only one could commit.

Prosecutors first charged Jonathan "Pee-Wee" Shaw with multiple counts associated with the armed robbery, including several counts related to Bishop's alleged assault (Cal.Penal Code §§ 211, 245(a)(2)). At trial, prosecutors argued that Shaw was

Bishop's armed assailant, and the jury found Shaw guilty on these counts. Having secured Shaw's conviction, prosecutors then reversed course and filed similar charges against Mango Watts. During Watts's trial, prosecutors contended that it was Watts—not Shaw—who threatened Bishop with the gun. As a result, both Shaw and Watts were convicted of second-degree robbery and assault with a firearm against Bishop, and both received sentence enhancements for personal use of a firearm in connection with these charges. To date, state prosecutors have made no attempt to correct either defendant's conviction.

The majority contends that Shaw was not denied his right to due process because his conviction was neither contrary to, nor involved an unreasonable application of, clearly established principles of federal law as defined by the Supreme Court. My own review of the Supreme Court's relevant cases suggests the opposite conclusion.

I.

Under the Anti–Terrorism and Effective Death Penalty Act (AEDPA), we may order habeas corpus relief to a state prisoner only if the state court's decision is "contrary to, or involve[s] an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court conviction involves an "unreasonable application" of federal law if it (1) "correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable," or (2) "extends or fails to

---

7. Because we find no constitutional violation, we do not consider Shaw's actual innocence claim. *See Herrera v. Collins,* 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (clarifying that actual innocence is not a free-standing basis for habeas relief; rather, an actual innocence claim depends upon the existence of an independent constitutional violation).

extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir.2000), *overruled in part on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

## II.

Any due process review involving prosecutorial malfeasance should take into account Justice Sutherland's statement in *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935):

> The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id.* at 88, 55 S.Ct. 629, *overruled on other grounds by Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

The prosecutor's duty to seek the truth and vindicate the demands of justice distinguishes his role from that of ordinary trial counsel. As the state's representative, the prosecutor may not assume "the role of an architect of a proceeding that does not comport with standards of justice." *Brady v. Maryland*, 373 U.S. 83, 88, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). While other litigants may seek to maximize their own self-interest at their adversary's expense, a prosecutor may not knowingly obscure the truth or employ other litigation tactics designed to produce a false conviction.

Thus, although the prospect of "different juries ... reach[ing] different results under [a] criminal statute ... is one of the consequences we accept under our jury system," *Standefer v. United States*, 447 U.S. 10, 25, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980), *quoting Roth v. United States*, 354 U.S. 476, 492 n. 30, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), prosecutorial foul play clearly is not "one of the consequences we accept" under our adversary system of criminal justice. A prosecutor's solemn responsibility to ensure that innocent suspects do not suffer unjust convictions extends beyond the maxim that "justice must satisfy the appearance of justice" in an individual case. *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954). When a prosecutor obtains a defendant's conviction pursuant to a false factual theory or otherwise allows an unjust conviction to go uncorrected, due process demands that he take affirmative steps to correct his error—even if the error originally was committed in good faith. *Cf. Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (describing the prosecutor's duty to refrain from exploiting false evidence to secure an unjust conviction as a principle "implicit in any concept of ordered liberty").

Contrary to the majority's implicit assertion, the Supreme Court "need not have addressed the identical factual circumstances at issue in [this] case in order for it to have created 'clearly established' law governing [this] case' "; rather, AEDPA's "unreasonable application" test applies whenever the Supreme Court has clearly

established a principle intended for application in variant factual situations. *Id.* at 1154. Without question, the prosecutors who presided over the trials of Shaw and Watts violated *Berger's* clearly established principles by employing a prosecution strategy "calculated to produce a wrongful conviction." *Id.* Even under AEDPA's stringent standard, such flagrant prosecutorial bad faith cannot withstand habeas review.

## III.

Shaw's due process argument will sound familiar to students of this circuit's habeas jurisprudence, for we considered the very same issue in *Thompson v. Calderon,* 120 F.3d 1045 (1997) (en banc), *rev'd on other grounds,* 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998). In *Thompson,* prosecutors brought capital murder charges against two defendants, obtaining convictions against both by presenting inconsistent factual theories in separate trials. *Id.* at 1055–57. We declared the state's conduct inimical to due process, and we vacated and remanded Thompson's first-degree murder conviction. *Id.* at 1058–59.

Although *Thompson* involved a pre-AEDPA habeas petition and therefore does not formally control our decision in this case, *Duhaime v. Ducharme,* 200 F.3d 597, 600 (9th Cir.1999), I consider *Thompson* persuasive authority for the purpose of determining whether Shaw's conviction violates the Supreme Court's "clearly established" due process requirement. *Id.* Our decision in *Thompson* rested on a complete review of the Supreme Court's past pronouncements concerning the due process limitations on prosecutorial decision making. Among these, we placed special emphasis on the Constitution's "overriding concern with the justice of the finding of guilt," *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976),

and the Due Process Clause's guarantee of "the right to a trial that comports with basic tenets of fundamental fairness." *Thompson,* 120 F.3d at 1058, *citing Lassiter v. Dep't of Soc. Servs.,* 452 U.S. 18, 24– 25, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). We stated that the Court had stressed the prosecutor's "unique duty to ensure fundamentally fair trials by seeking not only to convict, but also to vindicate the truth and to administer justice." *Thompson,* 120 F.3d at 1058, *citing Berger,* 295 U.S. at 88, 55 S.Ct. 629. We also observed that the Supreme Court had applied these clearly established due process principles in several decisions to reverse convictions obtained through false evidence whether discovered before or after trial. *Giles v. Maryland,* 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967); *Napue,* 360 U.S. at 269, 79 S.Ct. 1173. The import for Thompson's habeas challenge was plain: "From these bedrock principles, it is well established that when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime." *Thompson,* 120 F.3d at 1058. Put simply, we held that the Supreme Court's due process jurisprudence left little doubt that "the prosecutor's actions of advancing inconsistent theories constituted a 'fundamental and egregious error' that violated the Due Process Clause." *Id.* at 1059, *quoting Drake v. Kemp,* 762 F.2d 1449, 1470 (11th Cir.1985) (en banc) (Clark, J., concurring).

While it is true, as the majority suggests, that the prosecutors in *Thompson* presented not only inconsistent factual theories but also inconsistent testimonial evidence to support these theories, the *en banc* court's decision focused primarily on the prosecutor's bad faith in presenting inconsistent constructions of the relevant facts in the two trials rather than on con-

tradictions within the prosecution's testimonial evidence itself:

> The prosecution's theories of the same crime in the two different trials negate one another. They are totally inconsistent. This flip-flopping of theories of the offense was fundamentally unfair. . . . The state cannot divide and conquer in this manner. . . .

> Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed search for truth. In prosecuting [both defendants] for[a crime that only one could commit], the prosecutor changed his theory of what happened *to suit the state*. This distortion rendered [the first defendant's] trial fundamentally unfair.

*Id.* at 1059, *quoting Drake*, 762 F.2d at 1479 (Clark, J., concurring). The use of false testimony may exacerbate a prosecutor's malfeasance, but we recognized that the touchstone for due process analysis was "whether the prosecutor presented at the trial a theory and set of facts *that he knew contradicted* the theory and facts that he planned to advance, and eventually advanced, at [another defendant's] trial." *Id.* at 1058 n. 12 (emphasis added).

The majority goes to great lengths to distinguish *Thompson's* facts. I cite this case, however, not because the facts are similar to those presented here and therefore command a similar result, but rather because the decision illuminates "clearly established federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Thus, the majority's extensive effort to distinguish *Thompson's* facts misses the more important point: under the Supreme Court precedents cited and applied in *Thompson*, a prosecutor's bad faith presentation of inconsistent factual theories to convict two defendants for an offense that only one could commit violates clearly established constitutional principles. As the Supreme Court decisions cited in *Thompson* suggest, prosecutors may violate due process not only by the particular improper *means* they employ to secure convictions (i.e., inconsistent factual theories), but also by knowingly pursuing reprehensible *ends* (i.e., a wrongful conviction against one of the two convicted defendants).

Thus, *Thompson's* reading of the Supreme Court's "clearly established" due process requirements assist in disposing of this case. However, because *Thompson* did not involve habeas review under AEDPA, we did not consider at that time whether a contrary holding would constitute an "unreasonable application" of the Supreme Court's due process jurisprudence. Any uncertainty concerning *Thompson's* contemporary relevance was put to rest, however, by *Nguyen v. Lindsey*, 232 F.3d 1236 (9th Cir.2000). Like the instant case, *Nguyen* involved post-AEDPA habeas review of a prosecutor's use of inconsistent factual theories in separate trials against separate defendants. *Id.* at 1237–40. Citing *Thompson*, we explained:

> The Supreme Court has held that prosecutors violate a defendant's right to due process if they knowingly use false evidence. It follows that a prosecutor's pursuit of *fundamentally inconsistent theories* in separate trials against separate defendants charged with the same murder can violate due process if the prosecutor knowingly uses false evidence *or acts in bad faith*.

*Id.* at 1240 (internal citations omitted) (emphasis added).

Focusing on *Nguyen's* statement that a prosecutor may violate due process by "knowingly us[ing] of false evidence," the majority overlooks *Nguyen's* equally important principle: a prosecutor's "bad faith" presentation of fundamentally incon-

sistent theories likewise violates clearly established due process principles as defined by the Supreme Court. Contrary to the majority's assertion, *Nguyen* did not cite *Thompson* for the notion that a prosecutor may use inconsistent factual theories to convict two defendants of the same crime as long as these theories are "consistent with the evidence actually adduced at trial," *id.* Rather, *Nguyen* recognizes that prosecuting two defendants under inconsistent factual theories for an offense that only one could commit is inherently an exercise of bad faith:

> This [case] is not like the prosecutorial misconduct found by this court in *Thompson v. Calderon* .... The positions taken by the prosecutor in that case were fundamentally inconsistent because different defendants were charged in separate trials with the same murder that had been committed by an individual. In this case, *both defendants could be guilty of the same crime because of the nature of the crime*—the murder of an innocent bystander during gang warfare.

*Id.* at 1240–41 (emphasis added, internal citations omitted). In *Nguyen*, the prosecutor did not knowingly convict an innocent defendant because the crime *by definition* allowed for the prosecution of both defendants irregardless of which defendant physically pulled the trigger. Thus, unlike Shaw and Thompson, Nguyen did not—and, indeed, could not—argue that the prosecutor acted in bad faith. Although we distinguished *Nguyen's* facts from those presented in *Thompson*—just as the majority distinguishes *Thompson*—our analysis in *Nguyen* recognized that a state conviction in conflict with *Thompson's* holding would constitute an objectively "unreasonable application" of federal law.

Here there can be no serious dispute that prosecutors acted in bad faith when they knowingly obtained the conviction of an innocent defendant. Logic dictates that at least one of the two convictions was necessarily obtained through "foul blows." *Berger*, 295 U.S. at 88, 55 S.Ct. 629; *see also Smith v. Groose*, 205 F.3d 1045, 1051 (8th Cir.2000) (characterizing the prosecution's "use of factually contradictory theories" as "foul blows"). The state's decision to prosecute both Shaw and Watts separately under inconsistent factual theories for acts that only one could commit displayed shocking indifference toward "the fundamental conceptions of justice which lie at the base of our civil and political institutions," *Hebert v. Louisiana*, 272 U.S. 312, 316, 47 S.Ct. 103, 71 L.Ed. 270 (1926), and thus violated the core interests protected by the Fourteenth Amendment, *Mooney v. Holohan*, 294 U.S. 103, 112–13, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

## IV.

Whose due process rights were violated, Shaw's or Watts's? Clearly, only one of the defendants actually committed the offense against Bishop, and the prosecutor had a constitutional duty to atone for its bad faith prosecution of both defendants by attempting to correct at least one of the two convictions. *See Thompson*, 120 F.3d at 1059 (Kozinski, J., dissenting) (suggesting that "[i]n the case of mutually inconsistent verdicts, ... the state is required to take the necessary steps to set aside or modify at least one of the verdicts"); *Drake*, 762 F.2d at 1479 (Clark, J., concurring) (arguing that a prosecutor's use of inconsistent factual theories violates both defendants' rights). Shaw's claim that he, rather than Watts, was prejudiced by the prosecutor's conduct is not inconsistent with the record. By prosecuting Watts for the same offense under an inconsistent factual theory, the state arguably mani-

fested its rejection of the factual premises underlying Shaw's conviction and assumed a duty to ensure that "innocence [did not] suffer." *Berger,* 295 U.S. at 88, 55 S.Ct. 629. I cannot support an outcome that assumes a constitutional violation of either Watts's or Shaw's rights, but concludes there is no remedy. Thus, at very least, due process requires that we grant Shaw an evidentiary hearing to demonstrate prejudice. *Thompson,* 120 F.3d at 1064 (Tashima, J., concurring).

## V.

Guided by the Supreme Court's due process jurisprudence and persuaded by the reasoning employed in *Thompson* and *Nguyen,* I cannot accept the majority's conclusion that Shaw's conviction rested on a reasonable application of federal law as determined by the Supreme Court. True, the record indicates that Shaw participated in the robbery in some capacity, whether or not he personally assaulted Bishop. Nevertheless, state prosecutors were not entitled to attribute the discrete acts involving Bishop to both Shaw and Watts in order to artificially inflate their conviction tally. As Justice Douglas once cautioned, "[t]he function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall. His function is to vindicate the right of people as expressed in the laws and give those accused of crime a fair trial." *Donnelly v. DeChristoforo,* 416 U.S. 637, 648–49, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) (Douglas, J., dissenting).

Criminal trials function not only to punish the guilty, but also to satisfy society's interest in maintaining the criminal justice system's integrity and legitimacy. As such, "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194; *see also Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942) ("The public conscience must be satisfied that fairness dominates the administration of justice."). The Supreme Court has recognized on numerous occasions that our criminal justice system's legitimacy relies upon the "special role played by the American prosecutor in the search for truth in criminal trials," *Strickler v. Greene,* 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), and the Court has proscribed "improper methods calculated to produce a wrongful conviction." *Berger,* 295 U.S. at 88, 55 S.Ct. 629.

Here the prosecution abandoned its indispensable truth telling function when, in separate trials, it knowingly prosecuted two defendants for acts that only one could perform. If extended to other trials, these "divide and conquer" tactics will inevitably produce unjust convictions and undermine public confidence in our criminal justice system. *See Herrera v. Collins,* 506 U.S. 390, 420, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (O'Connor, J., concurring) ("Our society has a high degree of confidence in its criminal trials, in no small part because the Constitution offers unparalleled protections against convicting the innocent."). Because clearly established principles of federal law prohibit such tactics, I would reverse the district court's denial of Shaw's habeas petition. Accordingly, I dissent.