857 A.2d 65

**Erika Elaine SIFRIT**

v.

**STATE of Maryland.**

**No. 139, Sept. Term, 2003.**

Court of Appeals of Maryland.

Aug. 27, 2004.

78

80

Andrew H. Baida, Benjamin Rosenberg (Gerard P. Martin, Baltimore, on brief), for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, J.

A jury in the Circuit Court for Frederick County, on June 10, 2003, convicted Erika Sifrit ("Erika"), of first degree murder, second degree murder, and various theft charges.[1] Erika's convictions and this appeal arise out of events that occurred over the Memorial Day weekend 2002 in Ocean City, Maryland, resulting principally in the death of two people, Martha Crutchley and Joshua Ford.[2]

In a related case, a separate jury in the Circuit Court for Montgomery County, on April 9, 2003, convicted Benjamin Sifrit ("Benjamin"),[3] Erika's husband, of second degree murder and first degree assault of Martha Crutchley and accessory after the fact for the murders of both Ms. Crutchley and Mr. Ford. We granted Erika Sifrit's petition for writ of certiorari. *Sifrit v. State*, 380 Md. 232, 844 A.2d 428 (2004). Subsequently, while Benjamin's appeal was pending in the Court of Special Appeals, we granted his petition for writ of certiorari before consideration of his claims by the intermediate appellate court. *Adam v. State*, 381 Md. 324, 849 A.2d 473 (2004). Even though, many of the facts, issues and legal arguments in these two cases overlap we answer the issues and contentions of the parties in separate opinions of this Court.

Erika raises a number of issues on appeal:

1. Whether the State failed to comply with the express terms of the Memorandum of Understanding where the

---

1. Erika was also tried and convicted of burglary related to the break-in at Hooters.

2. Due to extensive pretrial publicity Erika's case was removed from the Circuit Court for Worcester County and transferred to the Circuit Court for Frederick County.

3. Benjamin is referred to by a number of witnesses by his nickname, B.J. When we quote the witnesses we shall also use the nickname.

State agreed not to prosecute Erika for murder if certain conditions were met.

2. Whether the State violated fundamental principles of fairness and due process by presenting two directly conflicting factual theories in separate trials of Erika and her husband, Benjamin, both of whom were charged with committing the same crimes.

3. Whether the police conducted an unlawful search of Erika's purse.

We shall affirm Erika's convictions. Based on the language of the pre-trial Memorandum of Understanding, entered into by Erika and the State, Erika represented that she had not participated in the murders, and she breached the agreement by thereafter making "prospective reliable inculpatory statements." In light of her breach, the State was not required to honor its obligations pursuant to the agreement. Secondly, a due process violation does not exist in a situation involving multiple trials based upon a single criminal transaction, unless the prosecution presents inconsistent theories and the inconsistency exists at the core, rather than the margins, of the State's case. It is not enough for us to find a due process violation that there are discrepancies because of rational inferences drawn from ambiguous evidence, provided the multiple theories are supported by consistent underlying facts. In the present case, the State's theory that Benjamin and Erika committed the criminal offenses together as a team remained consistent throughout both trials. Any inconsistency in inferences or emphasis placed on particular facts by the State was consistent with the State's underlying theory of the case and did not violate Erika's right to due process. Lastly, the search of Erika's purse did not violate the Fourth Amendment. The proper scope of Erika's consent encompassed all areas in her purse where the requested medication could have been contained.

## I.

On Friday, May 24, 2002, Martha Crutchley and her boyfriend, Joshua Ford, drove from Virginia to Ocean City,

Maryland, for the Memorial Day weekend. Erika and her husband Benjamin were also vacationing in Ocean City over the holiday weekend. On Saturday night, May 25, 2002, the Sifrits met Ms. Crutchley and Mr. Ford on a bus on their way to Seacrets, a popular Ocean City nightclub. The Sifrits did not have the exact change for the fare so Ms. Crutchley and Mr. Ford offered to pay the Sifrits' fare if they would buy them a drink when they arrived at Seacrets. The foursome and two other people from the bus, friends Anne Carlino and Jeff Hysee, spent the rest of the evening together at Seacrets.

What happened in the early morning hours following the night at Seacrets is unknown. We do know, however, that at 3:00 a.m. on Sunday morning, May 26, 2002, Erika called 911 claiming that people she did not know were in her condominium unit and she could not find her purse. She was "afraid I'm going to have a robbery here." The call abruptly ended and no one was dispatched to the condominium.

On Tuesday, May 28, 2002, one of Ms. Crutchley's co-workers notified the Fairfax City police that Martha Crutchley failed to show up at work following the Memorial Day weekend. Fairfax City police contacted the Ocean City police who found Ms. Crutchley's car outside the condominium where she and Mr. Ford were staying for the weekend. The police found the couple's belongings left in their condominium as if they had just stepped out. Concerned about Ms. Crutchley and Mr. Ford, the police began to search actively for them.

On May 31, 2002, around midnight, the Ocean City Police Department responded to an alarm call from the closed-for-the-night Hooters Restaurant and Bar merchandise store on 122nd Street in Ocean City. There they found Erika and Benjamin loading Hooters merchandise into their Jeep Cherokee. The couple were placed in handcuffs. Upon searching the couple, the police found a 9 millimeter handgun and a knife on Benjamin and a fully-loaded .357 magnum revolver tucked into Erika's blue jeans in the small of her back. Another knife was found on Erika. Discovered in the Sifrits'

car were a .45 calibre gun, ski masks, flex cuffs, and tape.[4] The two were arrested and charged with burglary.

At the scene of the burglary, Erika told the officers that she had anxiety problems and that she needed her Xanax and Paxil from a brown leather pouch in her purse located in the front of the Jeep. One of the police officers, Sgt. Beene, looked in Erika's purse for the pills. He found only one type of the pill inside the brown leather pouch. Sgt. Beene continued to look for the other type of pill inside a red pouch because he noticed medicine bottles in that pouch. When the officer did not find the second type of pill in the red pouch he looked in a zippered pouch in the back of the purse. There he discovered four spent .357 magnum shell casings and one live round. The sergeant continued to look for the second pill in a gray change purse, also inside Erika's purse, and found the identification cards of Mr. Ford and Ms. Crutchley.[5] Fearing for the safety of Ms. Crutchley and Mr. Ford, the police ordered an immediate search of the Sifrits' condominium.

Upon entering the Sifrits' condominium, the police observed photographs and two bullets on a glass table. The pictures were of the Sifrits, Ms. Crutchley, and Mr. Ford, taken before the murders. Both of the bullets on the table had been fired from the .357 magnum recovered from Erika at Hooters, and one of the bullets had Mr. Ford's blood and tissue on it. Police also found a key to Ms. Crutchley and Mr. Ford's condominium on another table. Crime scene technicians found bloodstains in the Sifrits' master bathroom on the top of the counter, the underside of the counter top, the floor, the floor under the vanity, the back side of the bottom drawer of the vanity, under the mirror, under the baseboard, under the

---

4. Investigators later found other items in the Jeep including but not limited to a knife, gloves, and undeveloped film.

5. There was also a silver ring with a dragon engraving found in Erika's purse that was later identified as belonging to Mr. Ford. DNA testing revealed blood from both Joshua Ford and Martha Crutchley on the ring. Ms. Crutchley was a major contributor to the DNA sample found on the ring and Mr. Ford was a minor contributor, according to a forensic chemist for the State of Maryland.

hot tub faucet, on the hot tub step, on a sailboat candle holder on the hot tub, on the window, and in the shower. Swabs were taken from these bloodstains, which were all later identified as matching the DNA of either Ms. Crutchley or Mr. Ford. There was also a hole in the back wall of the bathroom, fresh paint on the wall, and numerous cleaning supplies on the floor next to the bathroom door. The cleaning supplies, it was later discovered, had been purchased on Sunday, May 26, 2002, the day after Martha Crutchley and Joshua Ford were murdered.

Later, at the police station, Erika agreed to take Detective Bernal to where she claimed the bodies of Martha Crutchley and Joshua Ford were located. Erika directed Det. Bernal to two dumpsters located behind grocery stores in Rehoboth Beach, Delaware. Other officers went to the stores to check the dumpsters, but did not find the bodies. While Detective Bernal traveled with Erika to the places where she claimed he could find the bodies, she told the detective that her husband, Benjamin, had shot Mr. Ford and Ms. Crutchley, "cut their bodies into pieces" and "put them in garbage bags."

On June 2, 2002, Erika's then attorney, Arcangelo Tuminelli, entered into negotiations with Joel Todd, the State's Attorney for Worcester County, regarding the charges against Erika. A Memorandum of Understanding (MOU) came out of those negotiations. The MOU stated that Erika agreed to "cooperate with the State in the prosecution of Benjamin, her husband, and further agrees to testify truthfully on behalf of the State at his trial." The MOU provided that the State would not seek a sentence of death or life without parole against Erika as long as she provided reliable information to the State "... detailing the way and manner in which the bodies of Martha Margene Crutchley and Joshua Ford were packaged prior to disposal, as well as information on the location where the bodies were disposed of." The MOU also provided that if Erika took a polygraph examination and if she tested "... 'not deceptive' on all material questions related to the homicides of the victims ..." then the State would not

prosecute Erika for the homicide charges.[6] The exact language of the relevant portion of the MOU is as follows:

> Additionally, Defendant agrees to subject herself to a polygraph examination to be conducted by an active federal polygraph examiner, said examiner to be agreed upon by the State and Defendant. If Defendant tests "not deceptive" on all material questions related to the homicides of the victims referenced in Paragraph 1 above asked of her by the polygraph examiner, and absent any compelling independent evidence to the contrary (i.e. eye witness testimony, photographs and/or prospective reliable inculpatory statements by the Defendant) the State agrees not to prosecute Defendant for these homicide charges.

After the MOU was executed, Erika told Detective Bernal that most of Joshua Ford's and Martha Crutchley's body parts were in black garbage bags that Benjamin had packed into Navy kit bags before throwing in a dumpster. Erika told the detective that she helped Benjamin throw the bags containing the body parts in a dumpster behind a Food Lion grocery store. The Food Lion dumpster was located across the street from the dumpster that Erika had previously directed the detective to search. After searching the landfill where the contents of the Food Lion dumpster had been emptied, police recovered body parts of Mr. Ford and Ms. Crutchley. Police recovered only the left leg of Ms. Crutchley. Thus, her cause of death was never determined. Police recovered the torso and both arms of Mr. Ford. Additionally, two bullets fired from the .357 magnum recovered from Erika at Hooters on the night of May 31 were found in Mr. Ford's torso.

In an interview with Detective Bernal on June 24, 2002, Erika admitted to being present in the condominium that she shared with Benjamin when three of the shots were fired. Erika was scheduled to have a polygraph examination on July 23, 2002, but Deputy State's Attorney Scott Collins terminated the polygraph because of incriminating statements that Erika

---

6. Erika never took the polygraph examination.

made in her pre-polygraph interview with United States Secret Service agents. Erika filed a Motion to Enforce the Memorandum, which she claimed required that the State give her the polygraph examination. The Circuit Court for Worcester County denied the Motion to Enforce the Memorandum on the grounds that the incriminating statements that Erika had made violated a condition of the MOU.

At Erika's jury trial, much testimony was received concerning Erika's behavior in the days after Martha Crutchley and Joshua Ford were killed. On Tuesday, May 28, 2002, Erika and Benjamin went outlet shopping in Rehoboth Beach. Erika got a new tattoo, and the couple went to a Home Depot store to buy supplies to replace the bathroom door and to purchase paint for the condominium. At the Home Depot, Erika met and spoke to Anne Wright, who testified at the trial as follows:

Q Now I want to direct your attention back to May 28th of 2002 last year. Were you in Ocean City resort area about that time?

A Yes.

Q And did you have occasion to go to the local Home Depot store?

A We did ...

＊　　＊　　＊

Q And who did you meet?

A Erika Sifrit

Q And did you see anyone else with her?

A Um, her husband.

＊　　＊　　＊

Q Okay. Was the Defendant carrying anything?

A Um, she had a triangular shaped piece of wood.

Q And did she say anything to you about this triangular shaped piece of wood?

A She said do you believe that's all that's left of my door.

Q And did you respond?

A And I said that must have been some party.

Q Did she respond to you?

A She laughed and said I guess you could call it that.

The State's theory in both cases was that after leaving Seacrets that night, the two couples had returned to the Sifrits' condominium. Once in the condominium the Sifrits engaged in a "missing purse game" in which they claimed Erika's purse was missing. They demanded the other couple find the purse and when it couldn't be found, somehow got them into the upstairs bathroom where both Sifrits shot Mr. Ford and in some other manner killed Ms. Crutchley.

The State's theory is based in part on the testimony of Melissa Seling ("Melissa") who met the Sifrits the night of May 29 through her friend Justin Todd Wright ("Todd"). Melissa testified that when she met Todd, he and the Sifrits were intoxicated and she was the only one that was sober. Melissa joined the Sifrits and Todd at a couple of bars but she did not drink. At the end of the evening, Melissa was worried about Benjamin's ability to drive so she agreed to follow the Sifrits back to their condominium. When the four arrived at the condominium, Melissa, at Benjamin's urging, helped Erika up to the condominium because she seemed so intoxicated that she might fall over without help. Then, once at the door, Erika located her keys in her purse and opened the door with no problem. Erika began showing Melissa around the condominium. Within 5–10 minutes of having the purse at the door, Erika and Benjamin claimed that someone had taken Erika's purse and that Melissa had to look for it.

At some point during the search for the purse, Benjamin brandished a gun and became more adamant about finding the purse. Benjamin made a number of statements during the search regarding people that had been there before who had tried to rip them off and that he was "doing the world a justice by ridding the earth of bad people." Melissa testified that he also told her "if we ripped them off . . . he would kill us the same way he killed those other people." Melissa was not clear in her recollection whether Benjamin had said "just like *I*

killed the other people" or "just like *we* killed the other people" (emphasis added). Melissa testified that she felt threatened by the gun and asked that it be put away. She also testified that during the search she saw a door upstairs off of its hinges with a bullet hole in it. Eventually, Benjamin discovered the purse in a location that had previously been searched. He then sat down with Melissa to show her his gun and what he called Erika's gun, the .357 magnum used to kill Joshua Ford.

Erika was convicted of the first degree murder of Joshua Ford, second degree murder of Martha Crutchley, and theft related to the burglary at Hooters. She was sentenced to life imprisonment for the first degree murder of Mr. Ford, 20 years to run consecutive for the second degree murder of Ms. Crutchley, and 18 months to run concurrent for theft.[7]

Additional facts will be provided throughout this opinion as appropriate to our analysis.

## II.

### *The Memorandum of Understanding*

The first question presented for our review by Erika is whether the State failed to comply with the express terms of the MOU.

Prior to her trial, Erika filed a motion to enforce the agreement she had made with the State and to dismiss the homicide charges against her.[8] After an evidentiary hearing, the Circuit Court for Worcester County denied her requests. Erika argues that this Court should reverse her murder convictions because "the State violated fundamental principles of fairness and due process by breaching its written agree-

---

7. In a separate trial, Benjamin was sentenced to thirty years imprisonment for second degree murder of Martha Crutchley, 25 years to run concurrent for first degree assault of Martha Crutchley, and 5 years to run consecutive for accessory after the fact.

8. The motion was filed in and decided by the Circuit Court for Worcester County prior to the case being transferred to the Circuit Court for Frederick County.

ment with Ms. Sifrit and prosecuting her for the homicides of Ms. Crutchley and Mr. Ford." Erika's argument is unpersuasive.

Given the plain language of the agreement and the obvious intent of the parties, the Circuit Court did not err when it denied Erika's motion to enforce the memorandum of understanding and to dismiss the homicide charges against her. Upon review of the record, it is clear that Erika breached the agreement when she made "prospective reliable inculpatory statements" after the signing of the agreement with the State. It is clear from the language of the agreement itself that if such statements were made, the State would not be obligated to refrain from prosecuting her for murder. In light of those facts, it was entirely proper for the State to refuse to honor the rest of the agreement.

As the State points out, the State entered into the agreement with Erika based on her representations that she had nothing to do with the murders. After the agreement was signed, but just before the polygraph examination was to take place, Erika answered some preliminary questions by the examiners and unexpectedly revealed an intimate knowledge of the gruesome details of the murders and even admitted to her direct participation in them.[9] She now argues that, despite her confessions, the State should have conducted the polygraph examination to determine if she would have tested "not deceptive." In view of the fact that her pre-polygraph confession to participation in the murders was a direct breach of the agreement, conducting the polygraph after hearing those inculpatory statements would have been a pointless exercise.[10] To suggest that the State should have upheld its

---

**9.** Erika was advised of her *Miranda* warnings, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before the meeting with the examiners and there is no argument that *Miranda* has been violated. In addition, none of Erika's inculpatory statements made on the day of the meeting with the polygraph examiners were offered against her at trial.

**10.** For example, three of the polygraph examination questions that would have been asked include: "Did you shoot a gun at any of those

end of the bargain after the blatant breach by Erika is illogical and unpersuasive.

The written agreement referred to is a document entitled "Memorandum of Understanding" which was signed by the State's Attorney and by Erika's attorney on June 2, 2002. The first two paragraphs of the agreement read as follows:

1. In exchange for reliable information from the Defendant to the State detailing the way and manner in which the bodies of Martha Margene Crutchley and Joshua Ford were packaged prior to their disposal, as well as information on the location where the bodies were disposed of, the State of Maryland agrees not to seek the sentence of death or life without parole against Defendant.

2. Additionally, Defendant agrees to subject herself to a polygraph examination to be conducted by an active federal polygraph examiner, said examiner to be agreed upon by the State and Defendant. *If* Defendant tests "not deceptive" on all material questions related to the homicides of the victims referenced in Paragraph 1 above asked of her by the polygraph examiner, *and absent any compelling independent evidence to the contrary (i.e.* eye witness testimony, photographs and/or prospective reliable inculpatory statements by the Defendant) the State agrees not to prosecute Defendant for these homicide charges.

(Emphasis added.) In addition, paragraph 6 of the agreement notes that "if Defendant fails to comply with paragraphs 2 and 3[11] of this Memorandum of Understanding, this Memorandum

---

people? Did you cut on any of those people? Did you plan in any way to cause the death of those people?" As will be discussed further, after hearing the statements made by Erika about her participation in the murders, to conduct a polygraph examination in which questions such as those would be asked would have been pointless.

11. The State notes in its brief that from the context of the agreement, it is apparent that this should have read "Paragraphs 2 and 4." Paragraph 3 notes that the State may prosecute Erika for accessory after the fact and any charges other than homicide that were noted in the Statement of Charges served on her on May 31, 2002. Paragraph 4 of the agreement states that:

of Understanding becomes null and void (except for Paragraph 1)."

After conducting an evidentiary hearing on the matter, the trial judge determined that the agreement became null and void when Erika failed to comply with the conditions in Paragraph 2 of the agreement. The judge discussed the evidence of Erika's failure to comply with the agreement and noted the testimony regarding a conversation between the State's Attorney and Erika's then attorney. The judge noted that the parties agreed that "if she goes in there and tells the polygraph examiners, 'I'm the one that did one or more of the murders or I was an active participant in either one of them,' we don't have a deal." The judge stated that he believed the testimony that Erika's attorney agreed to that condition. Moreover, the judge stated:

> I also think that after the polygraph was called off by Mr. Collins and eventually Mr. Todd came down, I think the question was asked, "Are we in agreement now, she didn't complete the terms of this agreement?" or words to that effect, and that Mr. Tuminelli said, "Absolutely. Yes. That's so," or something close to that. He acquiesced and agreed. And I think that took place. I don't think they came in here and just simply made that up.

The judge also noted that he reviewed the interview between the polygraph examiners and Erika, and found that she did make "prospective reliable inculpatory statements."

■ Md. Rule 8–131(c) provides that when an action has been tried without a jury, "the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the

Defendant agrees to cooperate with the State in the prosecution of Benjamin Sifrit, her husband, and further agrees to testify truthfully on behalf of the State at his trial. Defendant agrees not to invoke her marital privilege at the trial or any pretrial hearing of Benjamin Sifrit. Defendant agrees to be interviewed by the State of Maryland as it prepares for the trial of Benjamin Sifrit.

trial court to judge the credibility of the witnesses." We must consider the evidence in the light most favorable to the prevailing party and decide "not whether the trial judge's conclusions of fact were correct, but only whether they were supported by a preponderance of the evidence." *Urban Site Venture II Ltd. Partnership v. Levering Assocs.*, 340 Md. 223, 230, 665 A.2d 1062, 1065 (1995). With that standard in mind, we see no reason to hold that the trial judge's findings of fact on this matter are clearly erroneous.

After reviewing the evidence, the trial court decided not to enforce the agreement against the State. The judge explained his decision by stating that there were certain conditions precedent to the agreement that Erika did not meet (meaning, not making any prospective reliable inculpatory statements) and that, consequently, most of the terms of the agreement were rendered impossible to perform. The trial judged summed up his reasoning by stating:

> [Erika] simply could not have answered the questions because they basically were the opposite of what she just told the polygraph examiner. So obviously she could not pass that part of it. She—it was—she made it impossible to perform. She did not meet the conditions precedent in the contract and that's how I see it.

The clearly erroneous standard does not apply to legal conclusions made by the trial judge, which are given no deference. This Court must determine whether the trial court's conclusions are legally correct "under a *de novo* standard of review." *Walter v. Gunter*, 367 Md. 386, 392, 788 A.2d 609, 612 (2002). The interpretation of a contract is ordinarily a question of law. *Wells v. Chevy Chase Bank, F.S. B.*, 363 Md. 232, 250, 768 A.2d 620, 629–30 (2001). In interpreting a written contract, "where the language employed in a contract is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court." *Wells*, 363 Md. at 251, 768 A.2d at 630.

In addition to the objective principles of contract interpretation, the interpretation of the agreement in this case

must also be interpreted by "the standard to be applied to plea negotiations ... of fair play and equity under the facts and circumstances of the case, which, although entailing certain contract concepts, is to be distinguished from ... the strict application of the common law principles of contracts." *State v. Brockman*, 277 Md. 687, 697, 357 A.2d 376 (1976) [12] Even considering fair play and equity, we can see no reason for the State to continue to abide by an agreement that was rendered void solely by the voluntary actions of the defendant.[13] While it is true that fairness and equity "require the State to be held to its bargain," there is no such requirement if the defendant has not performed his or her obligations under the bargain. *Brockman*, 277 Md. at 698, 357 A.2d at 384; *Blinken v. State*, 291 Md. 297, 309, 435 A.2d 86, 91–2 (1981) (noting that both the State and the defendant have a duty to uphold the terms of the agreement between them); *Butler*, 55 Md.App. at 435, 437, 462 A.2d at 1243–4 (stating that "[t]here is, of course, the ever-present reality that [the

---

12. It is appropriate to consider fair play and equity when reviewing an agreement between the State and a criminal suspect, where criminal charges are involved, even if that agreement is not technically a plea agreement. *See Butler v. State*, 55 Md.App. 409, 428–32, 462 A.2d 1230, 1239–42 (discussing "miscellaneous bargains" with the State that are not plea agreements, but nonetheless implicate due process considerations "[w]here there is pending before the judge a criminal charge"). We point out for the sake of clarity that the agreement in this case was not a plea agreement. Erika made no promise to plead guilty or nolo contendere when entering this agreement with the State. *Gray v. State*, 38 Md.App. 343, 356, 380 A.2d 1071, 1079–80 (1977) (stating that a plea bargain or plea agreement "contemplates a conditional plea of guilty or nolo contendere to one or more pending charges, the condition usually being either the dismissal or lessening of other charges by one means or another, or some concession being made with respect to disposition, or both."). Nonetheless, it is appropriate to consider due process when reviewing the agreement in the present case because there were criminal charges pending at the time of the agreement.

13. We think it is important to note at this point that Erika was represented by counsel when the agreement was made and when she met with the polygraph examiners. Consequently, no persuasive argument can be made that the State took some kind of unfair advantage of an unrepresented suspect, requiring a different outcome because of notions of fair play and equity.

defendant's] failure to abide by the terms of the agreement thereby relieves the State of any obligation to perform its part of the bargain;" and "If the appellant failed to live up to his promise, the State is, of course, relieved of its reciprocal obligation to forbear to bring charges."). One of Erika's obligations under the agreement in this case included an implicit representation that she was not culpable in the murders. Making "reliable inculpatory statements" as to her active participation in the murders is inherently incompatible with that representation. The trial court found,[14] and it is clear from our review that she made such statements and that consequently, the State was no longer obligated to adhere to the agreement.

Because we do not think it is necessary to the resolution of the contract questions in this case, we do not adopt the trial court's statements regarding conditions precedent and impossibility of performance of the contract between the parties. We do agree, however, with the denial of the motion to enforce the memorandum of understanding, but for a different reason.

■ It is clear that Erika breached the agreement because her preliminary statements to the polygraph examiners constituted "prospective reliable inculpatory statements."[15] Therefore, it is equally clear, from the plain language of the

---

14. The adequacy of the accused's performance of his or her end of the bargain is a factual question to be decided by the trial judge, unless the agreement between the accused and the State directs that someone else is empowered to decide if the accused has adequately performed. *Butler*, 55 Md.App. at 437, 462 A.2d at 1243–44.

15. Erika has argued that the term "compelling independent evidence to the contrary" means evidence appearing only *after* (and of necessity to her argument, not before) the conducting of the polygraph examination. There is nothing in the language of the agreement that demands or even suggests that interpretation. She has also argued that the term "prospective" necessarily means only inculpatory statements made *after the polygraph examination*. We reject those interpretations of the language of Paragraph 2. In our view, it is clear from the language of Paragraphs 2 and 6 that any reliable inculpatory statement made by Erika at *any time after the signing of the agreement* would be inconsistent with the premises of the agreement and would render void the State's promise not to prosecute the defendant for homicide.

agreement, that Erika failed to comply with Paragraph 2 of the agreement and that, as a result, the agreement became "null and void," pursuant to Paragraph 6 of the agreement. Erika's argument that the State made it impossible for her to comply with the agreement by refusing (after hearing her inculpatory statements) to conduct the polygraph exam is, thus, specious. In fact, Erika made it impossible for the State to continue to honor the agreement by her own actions. To argue that the State "had an absolute obligation to afford her the opportunity to take a polygraph examination" after Erika, of her own accord, unexpectedly confessed to direct participation in the murders, is untenable. Consequently, the cases cited by Erika regarding not permitting the State to repudiate its agreements are unavailing.[16] The State in this case did

---

**16.** We note that the case of *Jackson v. State*, 358 Md. 259, 747 A.2d 1199 (2000), does not support Erika Sifrit's position. In *Jackson*, the State and the defendant agreed that the State would dismiss child sexual abuse and other charges against him if the defendant agreed not to oppose a postponement of his case and if he was exonerated by DNA testing of a stain on a sheet belonging to the victim. *Jackson*, 358 Md. at 262, 747 A.2d at 1200. As agreed, the defendant did not oppose the State's request for postponement. *Jackson*, 358 Md. at 263, 747 A.2d at 1201. In addition, the results of the DNA test excluded the defendant. *Id.* The State realized later that they had tested the wrong sheet and then refused to honor the agreement. *Id.* We noted that the defendant had performed his end of the agreement, and we held that the State should be held to its end of the bargain, even though the State, in hindsight, had made a bad deal. *Jackson*, 358 Md. at 278, 747 A.2d at 1209. The present case is distinguishable because Erika Sifrit made reliable inculpatory statements that implicated her in the murders, leading to the trial court's reasonable conclusion that she did not perform her end of the agreement. As noted by the Court in *Jackson*, " '[w]e think that once the State has made a bargain, it is bound to adhere to the agreement *so long as the accused performs his part.*' " *Jackson*, 358 Md. at 275–76, 747 A.2d at 1208 quoting *State v. Thompson*, 48 Md.App. 219, 222, 426 A.2d 14, 16 (1981) (emphasis added).

*Osborne v. State*, 304 Md. 323, 499 A.2d 170 (1985), *abrogated on other grounds by State v. Hawkins*, 326 Md. 270, 604 A.2d 489 (1992), is similarly inapposite. In that case we held that the State could not rescind a plea agreement merely because it was surprised by the lower sentence imposed by the court after the defendant had performed his end of the agreement. *Osborne*, 304 Md. at 338, 499 A.2d at 177. Again, the present case is distinguishable because Erika breached the agreement she had with the State.

nothing to prevent Erika from complying with the agreement. Rather, Erika voluntarily made inculpatory statements after the signing of the agreement, rendering the agreement null and void and releasing the State from its promise not to prosecute her for homicide.

In order to support our holding that the Circuit Court did not err by finding that Erika made inculpatory statements, rendering the agreement null and void, it is appropriate that we discuss the preliminary statements made by Erika to the polygraph examiners.[17]

On July 23, 2002, Secret Service Special Agents met with Erika at the Ocean City Police Station to administer a polygraph examination. Prior to the examination, the Special Agents gave Erika the *Miranda* warnings and informed her that the polygraph examination was a voluntary process.

After escorting Erika to the examination room, the Special Agents began the polygraph pre-test interview. At that time, a standard U.S. Secret Service medical questionnaire was completed, followed by a U.S. Secret Service history questionnaire. While completing the questionnaires, Erika, "talked about her life before being married and then began to detail the relationship between she and her husband, Benjamin Sifrit."

Erika then began to describe in great detail the events of the evening of May 25, 2002. Erika stated that she and her husband were vacationing in Ocean City, Maryland, when they met another couple, Joshua Ford and Martha Crutchley, while boarding a bus on their way to Seacret's nightclub. After hanging out all night at the club with Mr. Ford and Ms. Crutchley, both couples decided to go "party" back at the Sifrits' condominium at 1:30 a.m., now the morning of the 26th. They took a bus to the Atlantis (where Mr. Ford and Ms.

---

**17.** The statements made by Erika are recorded in a July 24, 2002, "United States Government Memorandum U.S. Secret Service," written by one of the polygraph examiners and admitted into evidence at the motions hearing as Joint Exhibit 1.

Crutchley were staying) to pick up swimsuits and then the four of them walked on the beach to the Sifrit's condominium.

Erika stated that Joshua, Martha, and Benjamin stayed on the beach and that she went into the condominium to get beers for everyone. Once inside the Sifrits' penthouse unit, she noticed that her purse was on the back of the couch and not where she had originally put it. She stated that her jewelry and pills were missing so she called 911 to report that there were, "[i]ntruders in my house and my stuff is missing." According to Erika, she hung up on 911 when Josh came upstairs. She yelled for Benjamin to come up. Erika and Benjamin then accused Joshua and Martha of taking their things and Benjamin grabbed Erika's gun and pointed it at Joshua and Martha. Erika stated that when Benjamin took the gun, she "knew he was going to kill them." Benjamin told them to take off their clothes. The victims complied and, according to Erika, asked Benjamin and Erika why they were doing this and said that they did not take any of the Sifrits' things.

According to Erika, Benjamin continued to point the gun at the victims and told them to "[g]et in the bathroom." Joshua and Martha locked the door behind them and were "yelling and pleading for their lives." Erika stated that Benjamin asked her, "I'm supposed to fucking waste them? Cool?" The narrative continues as follows:

> Mrs. Sifrit said they were, "getting very loud and I just wanted them to shut up." Mrs. Sifrit said she was worried about the police coming and people out on the beach hearing them. She stated she could hear Martha yelling "help me, help me, help me!" and banging against the glass on the bathroom window. She stated she could hear Josh pounding on the bathroom door and yelling "Why are you doing this!" over and over.

> Mrs. Sifrit stated she told B.J. to, "Just fucking do it! You got them naked, you put a gun to their heads, just do it!" After she told us that she had said, "Just fucking do it![,]" [s]he stopped for a minute during the interview and said,

"Now you have me on murder." I asked Mrs. Sifrit what she meant by, "just fucking do it" and "just do it" and she continued by saying, "I meant just kill them." I asked Mrs. Sifrit this same question approximately ten times and her answer was always the same, "I meant kill them, I knew he wanted to."

\* \* \*

B.J. fired the Smith & Wesson into the bathroom door and then kicked it open. She described the kick as being so hard that B.J. fell backwards. The bathroom door flew open and lodged itself in the wall. B.J. went into the bathroom and Mrs. Sifrit stated she saw Josh fall to the right side of the bathroom against a closet. She said he was shot. Josh was still yelling, "Why are you doing this?" She then watched as B.J. took a "head shot" on Josh. According to Mrs. Sifrit, she then wet her pants and went to go sit on the edge of the bed and "waited for it to be over." I asked what she meant by "waited for it to be over" and she said the killings. Mrs. Sifrit said she heard two more shots close together (about 5 seconds) and then B.J. came out flexing his muscles covered in blood she described that "he had obviously put on himself." B.J. called Mrs. Sifrit into the bathroom.

Erika then went to the jeep to get their radios, check for their things on the beach, and to watch out for the police. She ran back up to the penthouse and into the bathroom. She stated B.J. said, "Baby, open your knife like I taught you. Get down there and check her to see if she's dead. Get down there and make sure ..." Mrs. Sifrit said, "But, I thought you said she ..."and Mrs. Sifrit walked over to Martha who was huddled in the fetal position under the vanity and began "to cut on her body." I moved into the position I thought Martha would have been in and Mrs. Sifrit corrected me and she herself got into the fetal position to show exactly how Martha was and where she cut on her body. Mrs. Sifrit said the blood was very deep around Martha and it got on her clothes as she went down on her

knee to cut on Martha. She showed us the right side of her abdomen above her right hip as the location she cut. She said, "I was surprised how much pressure it took to cut the skin since I had never cut someone before. I cut her twice like this." Mrs. Sifrit showed us how she held the knife and cut Martha. After saying, "I cut her twice" she stopped and said, "now you have me on murder." I asked her if Martha was dead or alive when she cut on her. Mrs. Sifrit said she did not know but thought Martha was probably dead. I asked if she checked Martha in any way before cutting on her and she said, "No."

Erika then went on to detail how the couple cut up the bodies, put them in black trash bags, placed them into Navy duffle bags and put the bodies in two separate dumpsters behind a grocery store. After sleeping for a while, the Sifrits cleaned the bathroom. The next day, on May 27, 2002, they went to the dumpsters to be sure that they had been emptied. Erika stated that sometime on May 27 or May 28, Benjamin "[m]ade a comment to her along the lines of, what a number she had done on Martha's throat. Mrs. Sifrit stated she did not deny cutting Martha's throat to B.J. She told us she was glad if he thought she had cut Martha's throat." In light of Erika's statements, the polygraph examiners did not administer the polygraph test.

It is clear, after reviewing the statements Erika made prior to her polygraph examination, that she breached the agreement by making reliable inculpatory statements and implicating herself in the murders. Once Erika breached the agreement, the State had no obligation to uphold its end of the bargain.

### III.

*Inconsistent Theories of Prosecution*

The first question presented for our review is whether the State violated Erika's right to due process by presenting factually inconsistent theories of the case at her trial and that of her husband, Benjamin. This is a matter of first impres-

sion in this State. Other courts, however, have addressed the issue and in the vast majority of cases failed to find a due process violation. We likewise fail to find a violation here.

The court that has addressed the issue of inconsistent theories the most is the United States Court of Appeals for the Ninth Circuit. It first addressed the issue briefly in the case of *Haynes v. Cupp*, 827 F.2d 435 (9th Cir.1987), in which Haynes relied on evidentiary and argumentative differences between his trial and that of a co-defendant to argue that his right to due process had been violated. Then Judge, now Justice, Kennedy wrote for the court that "[i]t is true that the trials differed in emphasis. However, the underlying theory of the case, that all three defendants were equally culpable, remained consistent throughout. In view of this underlying consistency, the variations in emphasis are not cause for reversal." *Id.* at 439.

More than a decade later, that court was again presented with the question in *Thompson v. Calderon*, 120 F.3d 1045 (1997) (*en banc*), *rev'd on other grounds*, 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998). In *Thompson* two men were charged for the same murder. The court found that the prosecuting attorney had offered conflicting theories regarding the two men's motives for committing the crime. In Thompson's case, the State argued that Thompson had raped the victim and then killed her to cover up the rape. *Thompson*, 120 F.3d at 1056–57. In the second defendant's case, the State argued that he had killed her because he saw her as a threat to his ability to reconcile with his estranged ex-wife. *Id.* The State presented completely different witnesses in the two trials, who, in some instances, provided testimony that wholly contradicted the testimony given in the other trial. *Thompson*, 120 F.3d at 1057. Relying in part on their *Haynes* opinion, the court stated that "it is well established that when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime." *Thompson*, 120 F.3d at 1058. The court continued, however, "when there are claims of inconsistent prosecutorial conduct,

reversal is not required where the underlying theory 'remains consistent'" *Thompson*, 120 F.3d. at 1058–9 (quoting *Haynes*, 827 F.2d at 439). Applying this standard to Thompson's case, the court found that "little about the two trials remained consistent other than the prosecutor's desire to win at any cost." *Thompson*, 120 F.3d at 1059. The court held that Thompson's right to due process had been violated.

In *Shaw v. Terhune*, 353 F.3d 697 (2003), the Ninth Circuit again returned to the issue. Like in *Haynes*, the court found that there had not been a due process violation. Shaw and an accomplice were both convicted of several crimes arising from an attempted robbery. Despite the fact that the evidence established that only one person had personally used a firearm during the robbery, the prosecutor argued at both trials that the man currently on trial had been the one to use the firearm. *Shaw*, 353 F.3d at 699. The court reviewed its holding in *Thompson* and found it "sufficiently dissimilar to the instant case that it is distinguishable." *Shaw*, 353 F.3d at 702. The court noted that the *Thompson* case had rested on the " 'peculiar facts' of the case." *Shaw*, 353 F.3d at 702 (quoting *Thompson*, 120 F.3d at 1059). "The prosecutor in *Thompson* did not merely suggest varying interpretations of ambiguous evidence; he 'manipulated evidence and witnesses, argued inconsistent motives, and in [the other defendant's] trial essentially ridiculed the theory he used to obtain a conviction and death sentence at Thompson's trial.' " *Shaw*, 353 F.3d at 702 (quoting *Thompson*, 120 F.3d at 1057). "By doing so, the prosecutor brought his conduct squarely within an area forbidden by the Supreme Court—the 'knowing [ ] present[ation of] false testimony.' " *Shaw*, 353 F.3d at 703 (quoting *Thompson*, 120 F.3d at 1058) (internal citations omitted) (alteration in original). Returning to the facts of *Shaw*, the court stated "[i]n this case, Shaw does not contend that the prosecutor presented false evidence, and in reality cannot do so, because the evidence was nothing more than ambiguous. The evidence presented at the two trials was almost identical, and supported several critical conclusions...." *Shaw*, 353 F.3d at 703. The Court concluded that

[c]learly established federal law prohibits a prosecutor from "knowingly presenting false evidence;" it does not preclude that prosecutor from suggesting inconsistent interpretations of ambiguous evidence. When prosecutors confront truly ambiguous evidence that supports multiple convictions for what is inherently a unilaterally committed crime, there are competing concerns involved. In these situations, prosecutors must retain some amount of discretion to change theories in later trials.

* * *

Since no clearly established federal law precludes a prosecutor from supporting two theories which are in tension with one another but which are each arguably supported by ambiguous evidence, Shaw's due process rights were not violated. . . .

*Shaw*, 353 F.3d at 703, 705 (citing *Nguyen v. Lindsey*, 232 F.3d 1236 (9th Cir.2000)).

The holding in *Shaw* is consistent with the Ninth Circuit case *Nguyen v. Lindsey*, in which the court found that a defendant's right to due process is not violated when a prosecutor uses inconsistent arguments at separate trials, provided the arguments are consistent with the evidence adduced at each trial and provided the prosecutor does not knowingly use false evidence or act in bad faith.[18] *Id.* at 1240.

In *Thompson*, the Ninth Circuit relied, in part, on a concurring opinion accompanying the *en banc* rehearing of an Eleventh Circuit case, *Drake v. Francis*, 727 F.2d 990 (11th Cir.1984), *rev'd* on different grounds *en banc*, *Drake v. Kemp*, 762 F.2d 1449 (11th Cir.1985). In *Drake v. Francis*, the

---

**18.** From a practical standpoint, the *Nguyen* court noted:

Nor is it shocking or even unusual that the evidence came in somewhat differently at each trial. Any lawyer who has ever tried a case knows that trial preparation is not a static process. As a case evolves, new witnesses come forward; others become unavailable. As new evidence is uncovered, other evidence loses its significance. What is received in evidence by stipulation in one trial might draw vigorous objections in another.

*Nguyen*, 232 F.3d at 1240.

defendant argued that by pursuing "wholly inconsistent theories" in his and a co-defendant's trial, the prosecution violated his right to due process. *Drake*, 727 F.2d at 994. Drake and a co-defendant were charged and convicted of the murder and armed robbery of a barber in Colbert, Georgia. In the co-defendant's trial the prosecutor argued that the co-defendant committed the murder while Drake played a lesser role. In Drake's trial, a year later, the prosecutor argued that the co-defendant was too old and weak to have committed the murder by himself and that Drake must have played a more significant role. The court found that "the only inconsistent theory propounded in the two trials was that [the co-defendant's] prosecutor believed [the co-defendant] was the sole murderer while in Drake's case, the district attorney urged that, due to sheer physical necessity, Drake must have participated in the attack as well." *Id.* "Viewed in this light," continued the court, "the two theories are fairly consistent and there was no due process violation." *Id.* On rehearing *en banc*, the majority of the court declined to reach the issue, instead granting relief on other grounds. *Drake v. Kemp*, 762 F.2d 1449 (11th Cir.1985) (*en banc*).

In *Smith v. Groose*, 205 F.3d 1045 (8th Cir.2000), *cert. denied, Gammon v. Smith*, 531 U.S. 985, 121 S.Ct. 441, 148 L.Ed.2d 446 (2000), the United States Court of Appeals for the Eighth Circuit addressed the issue in the context of a prosecutor relying on two wholly inconsistent and irreconcilable statements made by the same witness. In the first of two trials in *Smith*, the prosecution relied on a statement by a witness that the victims were alive when they entered the house and that a colleague of the witness testifying had, in fact, killed the victims. *Smith*, 205 F.3d at 1048. In a subsequent trial of a different defendant, the prosecutor relied on a different statement made by the same witness that the victims were dead when they arrived at the house. *Id.* "In short, what the State claimed to be true in [the first case] it rejected in [the second case], and vice versa. . . . This before/after distinction is the heart of the prosecutorial inconsistency that allowed the State to convict as many defendants as possible in a series of cases

in which the question of timing was crucial." *Smith*, 205 F.3d at 1050–1051. Although the court held that the actions of the State in this case "constituted foul blows ... that fatally infected Smith's conviction," the court also noted that "[w]e do not hold that prosecutors must present precisely the same evidence and theories in trials for different defendants. Rather, we hold only that the use of inherently factually contradictory theories violates the principle of due process." *Smith*, 205 F.3d at 1052. The court continued by noting that "Smith's situation is unusual, and we doubt that claims such as his will often occur. To violate due process, an inconsistency must exist at the core of the prosecutor's case against the defendants for the same crime." *Id.*

The theme requiring an inconsistency at the core of the state's case before finding a due process violation runs throughout the majority of cases that have addressed the issue. *Clay v. Bowersox*, 367 F.3d 993, 1004 (8th Cir.2004) (" 'To violate due process, an inconsistency must exist at the core of the prosecutor's cases against the two defendants for the same crime,' and the State's error must have 'rendered unreliable' the [petitioners] conviction."). *Id.* at 1004 (quoting *Smith*, 205 F.3d at 1052); *United States v. Paul*, 217 F.3d 989, 998–99 (8th Cir.2000), *cert. denied*, 534 U.S. 829, 122 S.Ct. 71, 151 L.Ed.2d 37 (2001) ("When it cannot be determined which of two defendants' guns caused a fatal wound and either defendant could have been convicted under either theory, the prosecutor's argument at both trials that the defendant on trial pulled the trigger is not factually inconsistent. Thus, because there was evidence that supported both theories, and since Paul could have been convicted of aiding and abetting under either theory, we find no error."); *Nichols v. Scott*, 69 F.3d 1255 (5th Cir.1995), *cert. denied, Nichols v. Johnson*, 518 U.S. 1022, 116 S.Ct. 2559, 135 L.Ed.2d 1076 (1996) (Finding that where the facts support the conclusion that either defendant could have fired the fatal shot, the prosecutor did not violate due process by arguing at separate trials that the man on trial was the one responsible for the fatal shot.); *Illinois v. Caballero*, 206 Ill.2d 65, 276 Ill.Dec. 356, 794 N.E.2d 251, 264

(2002) ("We conclude that no due process violation has occurred in the present case when the State's shifting positions involved matters of opinion, not of underlying fact."); *Iowa v. Watkins*, 659 N.W.2d 526, 532 (Iowa 2003) ("We are convinced that [*Thompson* and *Smith*] only stand for the proposition that a selective use of evidence by the prosecution in order to establish inconsistent factual contentions in separate criminal prosecutions for the same crime may be so egregious and lacking in good faith as to constitute a denial of due process. We view those situations as a narrow exception to the right of the prosecution to rely on alternative theories in criminal prosecutions albeit that they may be inconsistent. . . . This right is particularly obvious in cases in which the evidence is not clear concerning which of two persons is the active perpetrator of the crime and which of them is an aider and abettor of the active perpetrator." (Internal citations omitted.)).

 Based on our analysis of the relevant case law, we are in accord with the courts that hold that a due process violation will only be found when the demonstrated inconsistency exists at the core of the State's case. Discrepancies based on rational inferences from ambiguous evidence will not support a due process violation provided the two theories are supported by consistent underlying facts. We recognize that the evidence presented at multiple trials is going to change to an extent based on relevancy to the particular defendant and other practical matters. The underlying core facts, however, should not change. The few courts that have found due process violations did so in cases where the inconsistencies were inherent to the State's whole theory of the case or where the varying material facts were irreconcilable. It is this type of inconsistency that renders the conviction fundamentally unfair, thus violating due process. With this standard in mind, we return to the present case.

Erika relies primarily on four ways in which she believes the State's case differed in the two trials and in which she believes the differences rise to a violation of due process. They are: (1) ownership and possession of the murder weap-

on, (2) the testimony of Michael McInnis, (3) the testimony of Melissa Seling, and (4) the number of shots fired by each of the Sifrits.

None of the differences in the two trials alleged by Erika go to the State's underlying theory of the case which remained consistent throughout both trials, which was that Benjamin and Erika committed the crimes together. The differences raised are differences in emphasis and inferences regarding certain facts tending to show the guilt of the defendant currently on trial, but in no way exculpating the other Sifrit. Evidence offered tending to show Benjamin's guilt is not necessarily relevant to show Erika's guilt. Provided the evidence remains consistent with the underlying facts, the inconsistent emphasis or inferences will not amount to a due process violation.

We begin with the issue of who owned the murder weapon. The evidence presented at the two trials established that both Benjamin and Erika had access to the murder weapon throughout the week. According to the evidence, Benjamin purchased the gun, apparently for Erika, both had possession of the gun at varying times during the week following the murders, and the two often exchanged their various weapons. Based on these facts, it is not inconsistent for the State to argue at Benjamin's trial that the murder weapon was his.[19] Nor is it inconsistent with the facts for the State to argue at Erika's trial that the weapon was hers. The facts and inferences support both conclusions. Furthermore, considering the facts established that the Sifrits often exchanged their weapons and both had access to the murder weapon, determining who actually "owned" it is of no consequence.

---

**19.** The State's actual argument in Benjamin's trial regarding the weapon was, in part, that "Benjamin Sifrit, the defendant, controlled both guns on various occasions" and that the gun "was purchased by the defendant. He picked it out for his wife, and yet he would have you believe that he never fired it."

**108**

 The same is true with regard to the issue of whether Erika fired one shot or two. In both trials the State recognized that no one besides Erika and Benjamin can know for certain who fired which bullet.[20] The facts established that four shots were fired from the .357 magnum. Two of the four shots were found in Mr. Ford's torso. The other two bullets were found on the table in the Sifrit's condominium, one with flesh on it that matched Mr. Ford's DNA. It was the State's consistent theory that both Sifrits were present for the murders and that both participated in them by actually shooting at Mr. Ford and by luring the couple up to the apartment. Whether Erika's participation in the murders is limited to firing one shot or two, or simply by aiding Benjamin in luring the couple to their deaths, does not affect her culpability. Under either theory a jury could find both participants guilty of murder. This distinction falls squarely within the permissible differences allowed in *Paul, Nichols, Caballero,* and *Watkins* discussed above.

Erika also argues that the State's characterization of the testimony of Michael McInnis ("McInnis") in the two trials amounted to a due process violation.

 McInnis is a former Navy SEAL and friend of Benjamin. He was called by the defense at Erika's trial to recount a conversation that he had with Benjamin. McInnis testified that in 1999 the two men were at a strip club having drinks when the discussion turned to how Benjamin would dispose of

---

**20.** In Benjamin's trial the State argued:

I will never know and you will never know who pulled the trigger on that gun that night, but one thing is for certain: they were both there and they both—whichever one of them didn't pull the trigger aided and abetted the murder by helping the other one.

In Erika's trial the State argued:

No one in this room will ever know who did what to whom that night. There's certainly inferences to be drawn from the facts in this case, and the State has argued those inferences to you, but none of us will ever know definitively what happened in that room, but it's clear that the defendant was there. It's clear that the defendant participated to the extent of luring these people up there. She aided and abetted the crime of murder, which makes her guilty of the crime of murder.

a body if he ever killed someone. The conversation arose when McInnis asked Benjamin to "whack" his wife for him, to which Benjamin allegedly responded "[y]eah, sure." McInnis asked what the going rate was for "whacking" someone, to which Benjamin responded around $30,000. According to McInnis, Benjamin stated that he would dispose of the body by laying down plastic in a living room or an open space and then remove the arms, legs and head with a knife. Then he would remove the body in separate bags and dispose of the body in either the same dumpster over the course of a month or in different dumpsters throughout the city in a single trip. McInnis testified that the conversation was a typical conversation between SEALs, that they were "simply talking trash with guys over a few beers," and that the conversation was not to be taken seriously.

Erika argues that the State took inconsistent positions in the two trials with regard to this testimony. In Benjamin's case, the State made reference to this evidence as "crucial," but in rebuttal closing remarks in Erika's trial the State argued:

Michael McInnis told you as far as he was concerned, this was just guys talking over beer and nobody was serious about it. Now, that would sound easy if none of this other stuff had happened. Certainly it was a joke in McInnis's mind. In light of what happened this past Memorial day, perhaps it wasn't a joke in Benjamin Sifrit's mind. But, ladies and gentlemen, the important issue is not who quartered the bodies and put them in the dumpster, the important issue is who's responsible for their deaths?

We find Erika's argument unpersuasive. The question of whether Benjamin had thought about killing someone and how he would dispose of the dead body if he ever murdered someone is clearly more relevant to the State's case against Benjamin than it is to Erika's guilt or innocence in her role(s) regarding the murders. This is unlike *Thompson* where the prosecutor "essentially ridiculed the theory he used to obtain a conviction and death sentence in Thompson's trial." Rather, McInnis's testimony established that Benjamin had considered

committing almost the same type of crime three years before, not that he was incapable of committing the crime by himself. Furthermore, the question of whether the conversation was a joke is a matter of opinion, not fact. *See Illinois v. Caballero*, 206 Ill.2d 65, 276 Ill.Dec. 356, 794 N.E.2d 251, 264 (2002) ("We conclude that no due process violation has occurred ... when the State's shifting positions involved matters of opinion, not underlying fact."). The State's shifting position regarding whether McInnis's opinion that the conversation was a joke does not affect the core of the State's case and does not support a due process claim.

The final way in which Erika claims the State presented inconsistent theories is with regard to its reliance and interpretation of Melissa Seling's testimony at the two trials.

Melissa Seling was called as a State's witness against Benjamin and a defense witness in Erika's trial. At various points in Benjamin's trial, Melissa stated that Benjamin had told her that he was ridding the world of bad people, or that if they were "ripping them off, you know, he has had other people rip them off and if we ripped him off like the other people that were here, he would do the same thing to us that he did to them referring to the bullet hole in the door." On cross-examination in Benjamin's trial, the defense asked Ms. Seling "[y]ou are unsure whether or not he ever said he killed anyone, she killed anyone, or they both killed anyone; isn't that right, Ms. Seling?" To which she responded, "[n]o matter how you pick apart the words, he admitted to me throughout the night that in one way or another he was involved in the murder of these two people." Counsel then questioned her regarding her statement to the police shortly after the murders in which she said "[h]e was waving the gun around and making connotations to the people that they murdered and I am not sure if it was he murdered or she murdered or they both, you know, murdered them." The attorney asked if that was the truth at the time and she said it was still the truth. She eventually responded:

> He stated to me several times throughout the night that he was involved in these murders. Those ID's, those people,

you know, with the bullet in the door and everything. You can't just pick words apart like that and try to shift the blame, you know. The two people were there that night, four people and only two came out and that is what this is about.

In its closing argument in Benjamin's trial, the State argued that Melissa

is the best witness in this case, and I don't say that just because her testimony helps the State a lot, but everybody else in this case was so—had been drinking and Melissa had not.

\* \* \*

She told you the defendant told her, "If you're ripping us off, I'll do the same to you as I did to that other couple." He claimed he was ridding the earth of bad people. He admitted that he was involved in the killing of those two people, and he told her, "I don't overreact; I just react."

Later, in its rebuttal argument, the State argued:

Melissa told you the truth. Melissa was under oath today. She was not under oath when she talked to the police. There is no testimony or evidence that they placed her under oath when they questioned her.

The State then argued that Benjamin had admitted to these murders and that he had opened his heart to Melissa in stating "I killed two people. I killed two people."

In Erika's trial, Melissa was called as a defense witness and aggressively examined. She testified essentially as she did at Benjamin's trial with the same uncertainty regarding whether Benjamin uttered "he killed, she killed, they killed." The defense, obviously, was emphasizing her statements in which she stated Benjamin had said he killed the people or words to that effect. On cross-examination she testified that she was not positive which pronoun, "I, she, they," Benjamin had used, but that her general impression was that he was involved.

She also confirmed that she has never testified that Benjamin said anything about Erika not being involved.

In its closing remarks in Erika's trial, the State argued:

Melissa Seling was called to the stand Friday by the defense. She was a defense witness. Melissa Seling told you that she wasn't drinking that night, and that's uncontradicted. But B.J. was.

\* \* \*

Melissa was told that there has been another couple there a couple of nights before who tried to rip them off, and she told you that the defendant's husband said either I killed, she killed, or we killed, she wasn't sure which. Now, granted on one occasion she said I killed, quoting the husband. On another occasion she said we killed. Because of that contradiction, Det. Case told you that he asked her to clarify that, and then that's when she came back and said I killed, we killed, she killed, she wasn't sure.

The main thrust of the State's closing argument, however, was that the two were working as a team:

These two people are working as a team, ladies and gentleman. Erika, the defendant in this case, and B.J. Sifrit were working as a team. They worked as a team all week long. They were working as a team when they broke into Hooters. They were working as a team, we know, when they lured Melissa back to the unit, and I would submit, ladies and gentleman, they were working as a team when they got Josh and Geney back to the unit and ultimately killed them. Why invite two people back to your unit, your room, if you're completely innocent of what had happened a few nights before? Why would you ask two people to come back there and risk being harmed? If your husband is the bad guy, if your husband is the murdering son-of-a-gun that did this, why would you invite another couple to come there? It's an easy answer. Because you participated in it. You got a rush. You wanted them to come back. You wanted another rush.

 Based on our review of the record, we find no inconsistency in the State's position in the two cases. Melissa's testimony, while at times confused regarding whether Benjamin said "I killed, she killed or they killed," was fundamentally consistent throughout both trials. She may have been confused at various times regarding the pronoun used, however, she was clear that her impression of Benjamin's comments that night was that Benjamin had participated in the murder. She did not testify that anything that night led her to believe Erika was not involved, nor has the State ever taken this position. We find no inconsistency in the State's position sufficient to justify concluding that a due process violation occurred.

## IV.

### Search of Erika's Purse

The last question presented for our review is whether the trial court erred in denying Erika's motion to suppress evidence recovered from her purse the night she was arrested at Hooters. Erika made an oral motion to suppress the identification cards, shell casings, and everything that flowed from the search because she claimed that the search of her purse was unlawful. The Circuit Court denied the motion finding that the search of the purse was "valid and legitimate." The Court found that the search was permissible for any one of three reasons: (1) it was a search incident to a valid arrest, (2) it would have been inevitably discovered when the car was searched, (3) Erika consented to the search. We shall hold that the search was valid based on Erika's consent.[21]

Judge Battaglia, writing for this Court in *State v. Green*, 375 Md. 595, 826 A.2d 486 (2003), summarized our standard of review in Fourth Amendment cases. She wrote:

---

[21]. Because we find the search lawful based on consent we do not reach the issue of whether it would have been valid based on the other two theories.

The ultimate burden of proving that evidence seized without a warrant should not be suppressed falls on the State. In reviewing a Circuit Court's grant or denial of a motion to suppress evidence under the Fourth Amendment, we ordinarily consider only the information contained in the record of the suppression hearing and not the trial record. Where, as here, the motion to suppress was denied, we view the facts in the record in the light most favorable to the State, the prevailing party on the motion. With respect to weighing and determining first-level facts (such as the number of officers at the scene, the time of day, whether certain words were spoken, etc.), we extend great deference to the fact-finding of the suppression hearing judge. Therefore, "when conflicting evidence is presented, we accept the facts as found by the hearing judge unless it is shown that his findings are clearly erroneous." As to the ultimate conclusion of whether there was a Fourth Amendment violation, however, "we must make our own independent constitutional appraisal by reviewing the law and applying the facts of the case."

*Green,* 375 Md. at 607, 826 A.2d at 493 (internal citations omitted).

■■■ The Fourth Amendment to the United States Constitution provides, in part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." It is made applicable to the States by application of the Fourteenth Amendment. *See Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961); *Dashiell v. State,* 374 Md. 85, 94, 821 A.2d 372, 377 (2003). "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297, 302 (1991) (citing *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967)). The Supreme Court has long approved consensual searches because it is clearly reasonable for a police officer to search something once they have been given permission to do so. *Jimeno,* 500 U.S. at 250–51, 111 S.Ct. at 1803, 114 L.Ed.2d at 302 (citing *Schneckloth v.*

*Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973)). The scope of a suspect's consent is measured by an objective standard. *Jimeno,* 500 U.S. at 251, 111 S.Ct. at 1803, 114 L.Ed.2d at 302 (1991). The question is, "what would a reasonable person have understood by the exchange between the officer and the suspect" to be the scope of the consent? *Jimeno,* 500 U.S. at 251, 111 S.Ct. at 1803–1804, 114 L.Ed.2d at 302 (citing *Illinois v. Rodriguez,* 497 U.S. 177, 183–89, 110 S.Ct. 2793, 2798–2802, 111 L.Ed.2d 148 (1990)). The Court must also consider what the parties knew to be the object of the search at the time. *In re Tariq A–R–Y,* 347 Md. 484, 497, 701 A.2d 691, 697 (1997) (citing *Jimeno,* 500 U.S. at 251, 111 S.Ct. at 1803–04, 114 L.Ed.2d at 302–03 (1991)).

The only witness to testify at the suppression hearing regarding the search of the purse was Sgt. Beene. He testified that Erika had informed him that she had anxiety problems and was going to have a panic attack if she didn't take her medication, Xanax and Paxil. She told him what they looked like and that they were not in their original containers, rather they were in a brown zippered pouch in her purse. When Sgt. Beene looked in the brown zippered pouch, however, he only found one type of the requested pills. Next to the brown pouch was a red zippered pouch of the same size and feel as the brown one. He looked in the red pouch and found drugs inside but not the other one described by Erika. While continuing his search for the remaining pill, he looked in an open zippered area in the back of the purse and discovered spent shell casings. He also noticed "a gray change purse, snap-type change purse" that he opened to see if the medication was in there. Instead of the medication, Sgt. Beene found the identifications of Martha Crutchley and Joshua Ford, whom he recognized from their missing persons fliers. Shortly after the discovery, the immediate search of the Sifrits' condominium was ordered. The second type of pill was never found in the purse.

Erika argues that the scope of her consent was limited to the search of the brown zippered pouch located in her purse. The State, however, argues that Erika had asked the officer to

retrieve her medication, therefore it was reasonable for Sgt. Beene to look in the other places in the purse where the medicine might be located.

■ It is beyond question that the search was voluntary. Erika asked Sgt. Beene to go into her purse and retrieve her medication. The remaining question is what would a reasonable person have understood by the exchange between Sgt. Beene and Erika to be the proper scope of the consent? In making this determination we must take into consideration what the parties knew at the time of the search. Applying this standard, we conclude that, viewed objectively, it was entirely reasonable for Sgt. Beene to continue to look in Erika's purse for the missing medication. The purpose of the request and the subsequent search was to obtain Erika's medication to address her imminent panic attack. The subject matter of the search was the medication, not the brown pouch. Therefore, we hold the scope of Erika's consent extended to those parts of her purse which physically could have contained the requested medication. The search of Erika's purse and the pouches within it for her requested medication did not violate the Fourth Amendment.

**JUDGMENTS OF THE CIRCUIT COURT FOR FREDERICK COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**